IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GTC FINANCIAL SERVICES, LTD., an Illinois )
Corporation, and CHARLES T. GRANT, )
individually )
)
        **Plaintiffs,** )
)  Case No. 13-CV-08605
 v. )
)  Judge John Z. Lee
ASSET BUILDERS ASSOCIATES, LLC, a )
California limited liability company, and )
JAMES R. JURGENSEN, individually, )
)
        **Defendants.** )

## MEMORANDUM OPINION AND ORDER

Plaintiffs GTC Financial Services, Ltd. ("GTC") and Charles T. Grant ("Grant") sued Defendants Asset Builders Associates, LLC ("Asset") and James. R. Jurgensen ("Jurgensen"), alleging that Defendants had defamed Plaintiffs (Counts I and II) and tortiously interfered with Plaintiffs' expected future business dealings (Count III). Defendants filed a motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief could be granted. For the reasons set forth herein, Defendants' motion is denied with respect to Count I, but granted with respect to Counts II and III.

### Facts[1]

Asset is a California company that develops construction projects, including residential housing and energy generating facilities. Jurgensen is its managing member and principal. Compl. ¶ 3. For its part, GTC provides financial services as a "financier's agent" for developmental economic projects. *Id.* ¶ 2. Grant is GTC's President. *Id.*

---

[1]  The following facts are taken from Plaintiffs' Complaint and are accepted as true for the purposes of this motion to dismiss. *McMath v. City of Gary, Ind.*, 976 F.2d 1026, 1031 (7th Cir. 1992).

In May 2013, Jurgensen reached out to Grant, seeking financing for a residential project in Hawaii. *Id.* ¶ 10. When this project fell through, Jurgensen sought financing from Grant for a new solar energy generating plant in Southern California. *Id*. ¶ 11.

On August 22, 2013, the parties signed a Conditional Loan Commitment Letter. *Id.* ¶ 12 & Ex. A. Under the agreement, GTC agreed to underwrite and fund a loan from a "lending source" in the amount of $32.5 million for the project. The funding was contingent upon a mandatory site visit, construction cost evaluation, renewable energy feasibility study, confirmation of collateral, as well as other activities to be performed and overseen by GTC. *Id.* In return for its services, Asset agreed to pay GTC a fee of $27,500.00, $20,000.00 of which Asset paid when it provided GTC with a copy of its business plan. *Id.*

That project too failed to get off the ground, and Asset submitted to GTC another proposal to finance the development of another solar energy plant in Arizona. *Id.* ¶ 13. Asset also paid GTC the outstanding balance of $7,500.00 as well as a fee of $15,000.00 to reinstate the agreement. *Id.*

Prior to inspecting the Arizona site, Grant requested an additional $2,750.00 to expedite the processing of the loan; Jurgensen agreed. *Id.* ¶ 14. However, after Grant performed the site visit, Jurgensen refused to pay the fee and requested immediate funding of the $32.5 million loan, even though Asset had not completed its obligations under the agreement. *Id.* ¶ 15.

On November 29, 2012, Grant declared in a letter to Asset that the Conditional Loan Commitment letter had been breached and refused to proceed with the financing. *Id.* ¶ 16. Among the reasons cited by Grant were Asset's failures to satisfy a number of the conditions set forth in the agreement. The letter noted that "any binding commitment to the disbursement of

loan proceeds [was] subject to the due diligence and exclusive judgment of GTC" and deemed the matter "closed." *Id.* Ex. B.

On November 22, 2013, Jurgensen emailed Steve Dubois, a third-party broker of large commercial loans, stating that Grant "never had a client who could provide these funds and he never intended to approve the funding in the first place." *Id.* ¶ 20. Jurgensen also wrote in the email to DuBois that "Mr. Grant never intended to act in good faith or to fund this project." *Id.* ¶ 21.

Then, on November 28, 2013, Jurgensen emailed Grant copying DuBose and his fellow loan broker Helmuth Casteneda ("Casteneda"). *Id.* ¶ 31. The email threatened a lawsuit against Grant and GTC for "illegal activities as following: 1) Promissory Estoppel, 2) False Pretense, 3) Fraud, 4) Liability for Tortuous (sic) fraudulent misrepresentation or deceit, 5) Misrepresentation, 6) Extortion, 7) Intimidation, 8) Larceny or Grand Larceny, 9) Extortion, and 10) Negligence." *Id*. This action followed.

## **Legal Standard**

A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the allegations plead in the complaint. *Christensen v. Cnty. of Boone*, 483 F.3d 454, 457 (7th Cir. 2007). In order to avoid dismissal at this stage, a valid complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). What is more, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to have facial plausibility, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When deciding a motion to dismiss under Rule

12(b)(6), a court must assume all well-pleaded facts to be true, and all reasonable inferences from those facts are construed in favor of the non-moving party. *Killingsworth v. HSBC Bank*, 507 F.3d 614, 618 (7th Cir. 2007) (citing *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006)).

## Discussion

### I. Defamation Claims (Counts I and II)

Plaintiffs assert two claims for defamation. In Count I, Plaintiffs argue that the statements contained in the November 22, 2013, email to DuBois are actionable as defamation *per se*. According to Plaintiffs, these statements assert "a lack of integrity in the manner in which the Plaintiffs conduct their business activities, as well as lack of ability to fulfill the objective of the preliminary loan contract." *Id.* ¶ 27. In Count II, Plaintiffs contend that the statements contained in the November 28, 2013, email to Grant, on which DuBois and Casteneda were copied, likewise constitute defamation *per se*, because they accuse Plaintiffs of criminal conduct and lack of ability and integrity in their professional dealings. *Id.* ¶ 37.

Under Illinois law, "[a] defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 839 (Ill. 2006) (internal citations omitted). To state a claim for defamation, a plaintiff must allege facts demonstrating that "the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Id.* Such a statement is "defamatory *per se* if its harm is obvious and apparent on its face." *Id.*

4

A statement is defamatory *per se* if it consists of:

(1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication.

*Id*. (internal citations omitted).

Turning to Count I and the November 22 email, Jurgensen's statement that Grant "never had a client who could provide these funds and he never intended to approve the funding in the first place" and "never intended to act in good faith or to fund this project" can reasonably be inferred to impute that Grant is unable to perform his professional duties and lacks integrity in performing those duties. Such statements, if proven, give rise to a claim for defamation *per se*.

Defendants posit two arguments in their motion. First, they contend that the statements are more akin to statements of opinion because they are not verifiable. In a similar vein, Defendants also argue that these statements cannot form the basis of a defamation claim because they are controverted by the agreement itself. Neither argument is persuasive.

Defendants are correct that statements of opinion are not actionable. But, they are so only where the statements "cannot reasonably be interpreted as stating actual facts" about the plaintiff. *See Kolegas v. Heftel Broad. Corp*., 607 N.E.2d 201, 208 (Ill. 1992). In making this determination, Illinois law considers whether the statement in question has a precise and readily understood meaning; whether the general tenor of the context in which the statement appears negates the impression that the statement had factual content; and whether the statement is susceptible of being verified as true or false. *Hopewell v. Vitullo*, 701 N.E.2d 99, 103 (Ill. App. Ct. 1998).

Here, Defendants argue that the statements in the November 23 email do not have a "precise and readily understood meaning" because the agreement states, "GTC Financial is the Final Decision Maker and Funder for our Private Money Investor. In other words, we are the ABSOLUTE Money Source for the loan to Asset Builder Associates, LLC . . . ." Dkt. 15 (Mot.) at 5. In short, Defendants appear to argue that the statements are unverifiable because they simply are inaccurate. But, the Complaint alleges that Plaintiffs acted as "a financier's agent" (Compl. ¶ 2), and this allegation must be considered true for the purpose of this motion. Even if Plaintiffs were mistaken in believing that GTC was an intermediary, however, this in and of itself is not fatal because the statements at issue accuse GTC of "never intend[ing] to approve the funding in the first place" and that it lacked the "ability to provide sought-after funds." *Id.* ¶ 21. These are verifiable propositions.

*Kolegas*, 607 N.E.2d 201, is illustrative. There, the court held that statements by radio disc-jockeys that the producer of a classic cartoon festival was "not for real" and that he was "scamming them" because there was "no such show as the classic cartoon festival" were defamatory *per se*. *Kolegas*, 607 N.E.2d at 207. These statements were held to be actionable because they could reasonably be construed as asserting that the plaintiff was lying and that no festival would take place. Jurgensen's statements are more akin to those at issue in *Kolegas* than they are to the cases Defendants cite in their motion.[2]

---

[2] Defendants' authorities do not add support to their proposition. For example, in *Jacobsen v. Gimbel*, the court dismissed a defamation claim that was predicated on such statements as "[a]sk Marc Jacobson about Stuart's death, he helped him," and "Marc Jacobson helped Stuart kill himself." *Jacobsen v. Gimbel*, 986 N.E.2d 1262, 1266 (Ill. App. Ct. 2013). In *Schivarelli v. CBS*, the court dismissed a defamation claim premised on the statement "Let's sum this up for a second, the evidence seems to indicate that you're cheating the city" in a news report. *Schivarelli v. CBS, Inc.*, 776 N.E.2d 693, 696 (Ill. App. Ct. 2002). In both of these cases, the operative statements were too vague and ambiguous to substantiate a defamation claim. This is not the case here.

Although not a focus of the parties' briefs, the Court also notes that in Illinois, statements that are alleged to be defamatory *per se* also are subject to analysis under the innocent construction rule. *Chapski v. Copley Press*, 442 N.E.2d 195, 199 (Ill. App. Ct. 1982). The Illinois Supreme Court recently affirmed the rule, outlining its basic principles: "[T]he innocent construction rule advances the constitutional interests of free speech and free press and encourages the robust discussion of daily affairs. The rule applies only to claims of defamation *per se*, and it is justified due to the presumption of damages. A plaintiff can always avoid application of the innocent construction rule by seeking to establish a *per quod* action." *Tuite v. Corbitt*, 866 N.E.2d 114, 127 (Ill. 2006) (internal citations omitted). The innocent construction rule states that a "written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted . . . it cannot be actionable per se." *Chapski*, 442 N.E.2d at 199. If a statement is capable of a defamatory construction and an innocent construction, the innocent construction must be adopted only if it is reasonable. *Tuite*, 866 N.E.2d at 123 (citing *Bryson v. News America Publ'ns, Inc.*, 672 N.E.2d 1207, 1215 (1996)).

Like the DJ's comments in *Kolegas*, the statements in the November 22 email are not capable of a reasonable innocent construction. The "natural and obvious meaning of the words" suggests that Grant was looking to intentionally defraud Jurgensen from the start of the transaction, which is an imputation of Grant's integrity and ability in performing his professional duties. *Kolegas*, 607 N.E.2d at 207. Therefore, the Court declines to dismiss Count I.

Proceeding to Count II, Plaintiffs contend that the statements in the November 28 email are defamatory *per se* because they impute that the Plaintiffs have committed a crime. To be defamatory, the crime in question "must be indictable, involve moral turpitude, and be

punishable by incarceration rather than a fine." *Cantrell v. Am. Broad. Cos.* 529 F. Supp. 746, 755 (N.D. Ill. 1981). In interpreting statements that purport to impute a crime, the statements "must be taken in the sense which readers of common and reasonable understanding would ascribe to them and must be construed in the context of the entire [statement]." *Newell v. Field Enters., Inc.*, 415 N.E.2d 434, 436 (Ill. App. Ct. 1980).

The statement that forms the basis for this count consists of, in its entirety, a listing of offenses for which Jurgensen "threatened" to sue: "illegal activities as following: 1) Promissory Estoppel, 2) False Pretense, 3) Fraud, 4) Liability for Tortuous (sic) fraudulent misrepresentation or deceit, 5) Misrepresentation, 6) Extortion, 7) Intimidation, 8) Larceny or Grand Larceny, 9) Extortion, and 10) Negligence." Compl. ¶ 31. Standing alone without further context, this list lacks sufficient factual content to be construed as an imputation of criminal activity.

While Plaintiffs are correct that the complaint does not need to "state the commission of a crime in terms of art or with the particularity of an indictment" in order to establish a valid claim, *see Weber v. Hanover Park*, 768 F. Supp. 630, 638 (N.D. Ill. 1991), *abrogated on other grounds by Cruz v. Stasinopoulos*, 843 F. Supp. 435 (N.D. Ill. 1994), a "general statement, in the absence of factual context, is a statement of opinion, not objectively verifiable and devoid of factual content." *Dubinsky v. United Airlines Masters Exec. Counsel*, 708 N.E.2d 441, 451 (Ill. App. Ct. 1999). In *Dubinsky*, the court held that calling someone a "crook" in front of 30 to 40 coworkers and their wives is not actionable as a defamatory statement. As the court noted, "[o]ne cannot rely on an assumption that those who heard the statement were completely apprised of all the developments in the . . . controversy so as to create a definitive factual context for the use of the word 'crook.'" *Id.* More is needed than a laundry list of alleged offenses and a vague "threat" to begin litigation.

8

Here, it is not clear whether the statement in question is intended to be a list of activities that Jurgensen believed Grant committed, a collection of offenses that might apply to the situation, or simply a listing of general offenses off of the top of Jurgensen's head. There are no facts alleged as to why these offenses are listed, how they are related to Grant, when they might have occurred, or what evidence Jurgensen would offer to substantiate his claims. Compl. ¶¶ 30-38.

Plaintiffs rely on *Cantrell*, but the *Cantrell* court was working with a more robust factual backdrop. That case involved seven separate statements made by the host of a television program about and to the plaintiff, which allegedly intimated that the plaintiff was an arsonist. The court held that these statements, along "with the visual narrative" of the piece, the naming of specific dates when fires took place, the statement of a specific monetary incentive to set fires, and the fact that there were deaths involved was sufficient to constitute a viable defamation *per se* claim. *Cantrell*, 529 F. Supp. at 748-55. There is no such context for the statements at issue here. Rather, there is a generalized threat of possible pending litigation without additional factual detail necessary to ascribe the meaning Plaintiffs desire.[3]

Even if the statements in the November 28 email rose to the level of defamation *per se*, they would still be subject to analysis under the innocent construction rule. These statements could be reasonably viewed as a notification of pending legal action, giving the Plaintiffs time either to resolve the issues or prepare for litigation. Additionally, these statements could also be

---

[3] Plaintiffs cite the November 28 email as the sole basis for Count II. A court considering whether a statement constitutes defamation *per se* must analyze such statements without consideration of extrinsic evidence. *See Solaia*, 852 N.E.2d at 839 (a statement is defamatory *per se* only if "its harm is obvious and apparent on its face"); *Schaffer v. Zekman*, 554 N.E.2d 988, 991 (1990) (a statement is defamatory *per se* where "the defamatory character of the statement is apparent on its face, and extrinsic facts are not necessary to explain."). Plaintiffs here assert only defamation *per se*. Therefore, the Court considers only the November 28 email as the basis for Count II and does not read those statements in conjunction with the November 22 email that forms the basis for Count I.

viewed as "rhetorical hyperbole" used to attempt to force a resolution to the parties' ongoing dispute. *See Quinn v. Jewel Food Stores*, 658 N.E.2d 1225, 1232 (Ill. App. Ct. 1995) (holding that a supervisor calling a former employee a "con artist" is capable of innocent construction because it was a hyperbolic statement). Therefore, Defendants' motion is granted with respect to Count II.

## II.  Tortious Interference with Expectancy (Count III)

In Count III, Plaintiffs claim that the November 23 and 28 communications tortiously interfered with their business expectancy. To state an effective claim for tortious interference under Illinois law, a plaintiff must allege: 1) his reasonable expectation of entering into a valid business relationship; 2) the defendant's knowledge of the plaintiff's expectancy; 3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and 4) damages to the plaintiff resulting from such interference. *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. App. Ct. 1991).

While Plaintiff is correct that the "[o]pportunity to obtain customers is one of the expectancies protected by the tort action for interference with prospective advantage," *see* W. Prosser, Handbook of the Law of Torts § 130, at 950 (4th ed. 1971), the prevailing standard in Illinois is that a complaint must allege interference with specific potential customers or an identifiable class of customers. *See Crinkley v. Dow Jones & Co.*, 385 N.E.2d 714, 720-22 (Ill. App. Ct. 1978); *see also Parkway Bank & Trust Co. v. City of Darien*, 357 N.E.2d 211, 215 (Ill. App. Ct. 1976) (dismissing claim where "none of the particular acts stated allege that the defendants purposely caused a third person not to enter into or continue with prospective contractual relationship").

Here, Plaintiffs fail to plead that there was a legitimate expectancy that was prevented from ripening into a valid business relationship. Although Plaintiffs name DuBose and Casteneda as specific professionals that might be influenced by these statements in their decision to continue dealing with Plaintiffs, they fail to allege that Jurgensen's statements precluded Plaintiffs from entering into any particular contracts, negotiations, or plans with the two brokers. In fact, Plaintiffs do not allege that they suffered any possible damages arising from this purported interference.

The case cited in support of Plaintiffs' argument, *Knapp v. McCoy*, is distinguishable on the facts. While *Knapp* does serve an example as a tortious interference claim that survived a motion to dismiss, it comes in the context of misappropriation of marketing materials, not defamatory statements. In *Knapp*, the defendant presented the plaintiff's artwork as his own to radio stations in the market for this artwork. Accordingly, the court ruled that the defendant had interfered with the plaintiff's ability to obtain those stations as his own customers. Additionally, he had interfered with a general class of customers, "radio stations," that caused plaintiff to lose potential customers. *Knapp v. McCoy*, 548 F. Supp. 1115, 1117 (N.D. Ill. 1982). The defendant knew that by presenting the artwork as his own, he would be interfering with the plaintiff's ability to gain those customers. *Id*. Here, Plaintiffs do not allege an actual interference with a resultant loss, nor do they allege that they lost any particular customers as a result of the communications, or that there were any incipient deals that were cancelled as a result. Accordingly, Defendants' motion with respect to Count III is granted.

## Conclusion

For the reasons set forth herein, the Court grants in part and denies in part Defendants' motion to dismiss [dkt. 15]. Plaintiffs' second defamation claim (Count II) and tortious interference with expectancy claim (Count III) are dismissed. The remainder of the motion is denied.

**SO ORDERED**                **ENTER: 7/22/14**

*/s/ John Z. Lee*

**JOHN Z. LEE**
**U.S. District Judge**